IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 12–36–M–DWM |
| Plaintiff, | |
| vs. | ORDER |
| CHRISTIN DIANNE DIDIER and SURAYYA MAHASIN NASIR, | |
| Defendants. | |

This criminal case was tried to a jury but it should not have been given to them for decision. It was submitted to the jury on a theory of mail fraud as set forth in the indictment but, upon reflection, that criminal theory cannot be sustained when the proof of materiality is at odds with a contractual obligation to pay what was supposedly gained by fraud. Chubb, the alleged victim of mail fraud, was obligated to pay Didier a substantial sum of money, undefined except in ambiguous language in the contract of insurance it wrote, because she could not live in her lake mansion due to covered losses to that home. Chubb argued to state and federal regulatory and investigative agencies that it had been victimized when Didier misrepresented the nature of her temporary residence. But, because Chubb

-1-

was obligated to pay her an amount sufficient to maintain her standard of living in a mansion with multiple bedrooms, multiple baths, and even a ballroom whatever she said could not have been material to Chubb. The answer to the question of whether the element of materiality can be shown under such circumstances is that materiality cannot be proven when the entity supposedly victimized by mail fraud is obligated to pay what the government claims was a loss caused by fraudulent representations of the insured.

Every day in this country there are thousands, if not hundreds of thousands of insurance claims made or resolved. In many of those claims the carrier pays the policy value of the roof destroyed by wind, the collision damage from a wreck, or the estimated value of windshield damage. Likewise, everyday insurance adjusters engage in thousands of transactions and adjustments concerning liability payments, home owners claims, or replacement value disputes. If the government's theory is correct about materiality being a separate issue from the contractual obligation to pay, then each of these events could give rise to indictment for mail fraud. Is it mail fraud when the owner of a damaged car gets the requisite three estimates, obtains payment by mail from the carrier but then has someone else do the work, pocketing the difference or savings? What if the owner never has the damage repaired, is that fraud? Is it mail fraud when the water heater

leaks and destroys the beautiful wooden floor in the kitchen and the adjuster issues a check in the mail for the replacement cost and the homeowner elects to install linoleum or chooses not to fix the wooden floor but pockets the difference in cost? Is it mail fraud when the adjuster compromises the personal injury claim with a third party by erroneously telling them comparative fault applies when the injured person is an innocent passenger, using the underpayment to bolster corporate and personal profits? Is it mail fraud when an auto carrier tells an insured in Montana that policy limits cannot be stacked, contrary to established law? Is it mail fraud when Chubb issues a "white glove" policy that requires it to pay to maintain a standard of living and its adjuster unilaterally uses the wires to declare the "cost is too much" even though the policy requires it to pay according to a subjective standard? Materiality cannot legally exist if the purported victim is contractually obligated to pay what it was allegedly deprived of by misrepresentation or lies. That is why a judgment of acquittal must be entered in this case.

Ms. Didier and Ms. Nasir were convicted of mail fraud and conspiracy to commit mail fraud March 22, 2013, after a week-long jury trial. The Defendants' Motions for a Judgment of Acquittal are now pending.

For the reasons discussed below, there was not sufficient evidence to support the Defendants' convictions on Counts I-IX of the Indictment.

# I.    Statement of Facts

Sometime in July of 2005, Christin Didier bought a large mansion in Somers, Montana. The home was built in 1903 and had fourteen separate bedrooms, multiple fireplaces, and three bathrooms, as well as what was described as a ballroom. The property was located on nearly five acres of land and has extraordinary views of Flathead Lake. When she bought the mansion, Ms. Didier also purchased an expensive white glove insurance policy on the home written by Pacific Indemnity Company, a division of Chubb Insurance. The Chubb Masterpiece Policy she purchased included liability coverage as well as coverages for the structure and its contents. It is described as a white glove policy marketed specifically for high end homes and high net worth customers that Chubb intended to give special treatment. The premium cost for the policy was nearly $1,000 per month.

After she had been living in the house for two years, in July of 2007, the mansion was damaged by a tornado. Didier filed a claim with Chubb Insurance, which Chubb began the process of adjusting so necessary repairs could be made. That winter another untoward event took place; either due to damage to the boiler from the earlier wind occurrence or because of a lack of fuel, Didier began using portable diesel-fueled heaters and the mansion's wood-burning fireplaces as a

source of heat. A fire happened on January 11, 2008 that caused extensive damage to the residence, rendering it uninhabitable and ultimately leading to the indictment in this case.

To start with Didier and Chubb agreed that losses from the wind and fire were covered by her Masterpiece Policy. They also mutually agreed it was necessary for her to vacate the house until repairs were completed. A major clause of Chubb's policy anticipated this event and it provided assurance that her standard of living would not be altered because she had to temporarily abandon the mansion while repairs took place. Chubb set out to find Ms. Didier alternate housing under the policy's additional living expenses coverage. This insurance clause obligated Chubb in the following way:

> If your house cannot be lived in because of a covered loss to your house or, if applicable, to your contents, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living. We cover this increase for the reasonable amount of time required to repair, replace or rebuild your house or your contents, or if you permanently relocate, the shortest amount of time required for your household to settle elsewhere. This period of time is not limited by the expiration of this policy.

Chubb was obligated to pay whatever it took to make sure Didier maintained her standard of living, regardless of where she lived, even if her normal living expenses went up. In this regard Chubb conceded that the fire was a covered event

that would require Ms. Didier to vacate the premises for at least six months while repairs were made. The Masterpiece Policy required undefined payment to Didier, constrained only by her usual standard of living at the Somers mansion.

In setting the stage to resolve the materiality issue in this case it is important to keep in mind that if the language of a policy drafted by the insurer is ambiguous, courts will construe the ambiguity against the insurer and in favor of extending coverage. *Giacomelli v. Scottsdale Ins. Co.*, 221 P.3d 666 (Mont. 2009). The purpose of this canon of construction is to give protection to the insured because insurers draft the language of the policy. *See Pablo v. Montana*, 995 P.2d 460 (Mont. 2000). Likewise, if a clause of an insurance contract is subject to more than one reasonable interpretation, if it is ambiguous, obscure, or subject to different interpretations, the policy must be construed most favorably for the insured particularly when there is some attempt to exclude the liability of the carrier to make the necessary payment. *See Head v. C. Reserve Life of N. Am. Ins. Co.*, 845 P.2d 735,742 (Mont. 1993). Resolving an ambiguous clause to favor Chubb in this case is inconsistent with the general rules of insurance contract interpretation and turns payment of a contractual obligation into a sword of conviction simply because the carrier paid what it owed, but did so based on mistaken reasons imparted to it by its insured. The focus of the obligation to pay is

not on where the insured chooses to live when expelled from her mansion by a loss, rather it is what is the cost of keeping her standard of living the same, even if it costs more than her actual expenses, based on the mansion she could no longer inhabit.

The nature of the Somers mansion and Ms. Didier's use and enjoyment of it presented a challenge to Chubb in meeting their guarantee to provide replacement housing that would maintain her standard of living. The Somers mansion and estate were exceptional properties in the Flathead Valley. The size of the mansion, its historic character, and surrounding estate, as well as panoramic views of Flathead Lake are rare, especially in a replacement rental property. The loss was complicated by Didier's living situation. She used the property in a way that was specialized and somewhat incompatible with many rental arrangements. When the fire loss happened, Didier was living at the Somers mansion with her elderly mother who was suffering from Alzheimer's disease. She also had several dogs on the property, some estimates as high as twenty to thirty Pugs, as part of her household.

When Chubb was handed this unique high end loss it retained a temporary housing vendor, ALE Solutions, Inc., to find suitable replacement housing. Chubb initially authorized ALE to offer Ms. Didier and her household hotel

accommodation as a stopgap to provide her shelter with heat during the cold Montana winter. The idea was unworkable because Didier had concerns about her mother and her dogs. While ALE searched for housing that would match the standard of living in the mansion, Didier stayed at the mansion despite the fire-damage. Ms. Didier offered to live in a mobile home or trailer, but that offer was not acted on by ALE and Chubb due to cost.

The search to replace the mansion proved difficult for ALE. They located a bed and breakfast in Whitefish, Montana willing to cancel its reservations to accommodate Ms. Didier. Chubb's adjuster said no to this property because its owner was not willing to sign a six month lease with option to renew. ALE later found a fully furnished home with eight bedrooms. Chubb's claims adjuster again rejected the corporate property due to the $40,000 per month cost. Evidently relying on the notion that it was obligated to replace the mansion, Chubb's adjuster told ALE to look for a place costing $10,000 to $15,000 per month as an appropriate price range. In other words, Chubb acknowledged it had to pay based on the replacement cost, not the value of where Didier, her mother and her dogs actually lived. ALE then returned to negotiations with the bed and breakfast owner, eventually reaching an agreement to rent the six bedroom, three and one-half bath property for just over $10,000 per month for six months with an option to

renew.

ALE presented the idea of the Whitefish bed and breakfast to Ms. Didier on January 22, 2008 and encouraged her to visit the property. She did so but after visiting the property, Ms. Didier rejected the Whitefish bed and breakfast as replacement housing because it was too far from her home in Somers.

On January 28, 2008 Ms. Didier contacted ALE, informing them she had a lead on a property in Rollins, Montana that would be a better fit for her household. ALE responded to Ms. Didier and asked her for more information about the property. Ms. Didier put ALE in contact with Ms. Nasir. Ms. Nasir represented herself as broker for the Didier Family Trust and began communicating with ALE by fax and email.

When placing a customer in temporary housing, ALE collects information regarding the property in a form called a "preap" and then evaluates these details internally before presenting the proposed placement to the insurance adjuster. Typically the preap is completed by ALE based on information provided by the landlord or property manager over the telephone or in-person. In this case, ALE's representative sent the preap to Ms. Didier for completion. Ms. Didier or Ms. Nasir completed the preap and faxed it back to ALE with the necessary information. Notably these communications were not with Chubb.

The preap as completed by Ms. Didier represented that the Rollins property was 6900 square feet, with five bedrooms and two bathrooms. This information was false. The document detailed proposed financial terms for the temporary housing arrangement, including a base rent of $15,250 per month, a $7,000 security deposit, a $5,000 pet deposit, a $200 application fee, a $1,500 cleaning fee, and a 10% broker fee. Chubb did not question the coverage for any of the claims. ALE transferred the handwritten preap as completed by Ms. Didier to an electronic format and processed it for Chubb's approval.

ALE contacted Ms. Nasir for more information regarding her role in the transaction. It confirmed her role as broker on behalf of the Didier Family Trust and confirmed that the broker fee was a one-time fee.

ALE also asked Didier for more information about the Rollins property. ALE had concerns about Nasir's statement that she represented the Didier Family Trust. It needed confirmation that the Rollins property was not Ms. Didier's own property and that the property was actually held in trust by her extended family. Didier confirmed.

Didier, her mother, and the dogs stayed in the Somers mansion, surrounded by smoke and fire damage and without adequate heat, until January 27, 2008. Then she moved her household to the Rollins property. She moved her household

to the Rollins property before the Chubb adjuster gave final approval to ALE to enter a lease agreement to use that property as replacement housing. On January 31, 2008 there was an email exchange between the Chubb adjuster and ALE. Ms. Didier had been very demanding about acceptable accommodation. The adjuster expressed frustration with her demands and approved the Rollins proposal to just "shut this lady up." Chubb eventually approved the Rollins property as temporary housing for Ms. Didier on the terms she proposed.

A short time later, on February 4, 2008, ALE received a lease, a payment letter of commitment, a temporary housing agreement, and a move-in form for the Rollins property. The payment letter of commitment was executed between ALE and the landlord detailing the nature of the transaction including the monthly rent. The temporary housing agreement was also executed between ALE and the insured detailing the nature of the transaction as temporary replacement housing in connection with the Chubb insurance policy. The move-in form was completed by Didier detailing the condition of the property on move-in. All of these documents were based on information contained in the preap and flow from the Chubb adjuster's approval of the preap.

With the paperwork complete, ALE started the covered payments. It sent a $10,875 check to Ms. Nasir for the broker fee and application fee. That check was

sent by mail or common carrier from an office in Illinois to Ms. Nasir in

California. She accepted and deposited the check.

ALE also sent checks to the Didier Family Trust. The checks were sent from

ALE's office in Illinois to Didier's sister in Lewistown, Montana. The sister then

sent the checks to Ms. Didier's Somers address. Didier deposited the checks into

an account at Glacier Bank, held in the name of C.D. Didier Family Trust, Christin

Didier. Seven checks were sent by common carriers DHL, FedEx, and the United

States Postal Service. Those checks were for monthly rent for January to June

2008, the security deposit, pet deposit, and the cleaning fee. The payments totaled

$122,791.50 for the term of the lease of the Rollins property.

Before the wind event and fire giving rise to Ms. Didier's insurance claims

to Chubb she filed for Chapter 11 bankruptcy. Her initial Chapter 11 petition was

filed July 2007. During those proceedings, Ms. Didier represented that the Rollins

property was owned in trust and not an asset available for liquidation under her

Chapter 11 plan.[1] Two years later in July of 2009, Ms. Didier's Chapter 11 filing

was converted to Chapter 7 by order of Judge Kirscher. Her schedule of assets was

amended after conversion to Chapter 7 and the trust designation was removed as

to the Rollins property. She objected to the sale of the Rollins property by the

_____

[1]        Didier is not charged with bankruptcy fraud.

bankruptcy trustee because she claimed it was owned in trust and not a personal asset. Judge Kirscher ultimately ruled that Ms. Didier was the trustor, trustee and sole beneficiary of the trust. *See In re Didier*, 2010 WL 817403 at *4 (Bankr. D. Mont. March 5, 2010). The Rollins property was eventually sold by the Bankruptcy Trustee.

In February 2008, the Special Investigation Unit at Chubb Insurance took note of Ms. Didier's file and began work to validate her claim and evaluate her replacement housing. It had taken none of these steps before the insurance payments were approved. Chubb's investigator had access to the adjuster's claim files and assembled other information regarding Ms. Didier's claim from ALE. Chubb's investigator also hired a private investigator to visit the property and closely monitored Ms. Didier's ongoing bankruptcy filing.

The Special Investigation Unit's work discovered Didier's control over and benefit from the C.D. Didier Family Trust. It also revealed the Rollins property to be a cabin of approximately 860 square feet, two bedrooms, no bathrooms, and no indoor plumbing. Representations about other amenities and furnishings documented on the move-in form were also revealed to be at odds with the actual physical condition of the Rollins property. The representation that there was an in-ground pool was false as there was only an above-ground pool on the property.

Ms. Didier had fudged and lied about the Rollins property.

As a result of these revelations, Chubb's investigator conducted two examinations under oath with Ms. Didier. In examinations under oath on June 19, 2008 and September 15, 2008, Ms. Didier explained the description of the Rollins property on the preap as consistent with her definition of bedrooms, bathrooms, and methods of calculating square feet. She admitted she was in control of the C.D. Didier Family Trust and, as such, was the real owner of the Rollins property.

In July 2008, Chubb's investigator conducted a surprise examination under oath with Ms. Nasir at a restaurant in San Diego, California. Ms. Nasir confirmed her role in the transaction as broker for the C.D. Didier Family Trust. At some point she offered to send her file to Chubb's Investigator but never did.

In January 2009 Chubb complained to the Insurance Division of the Montana State Auditor's Office which is also the state's Commissioner of Securities and Insurance. The State Auditor's Office reviewed the complaint and opened an investigation. They interviewed Ms. Didier and Ms. Nasir.[2]

Ms. Didier was voluntarily interviewed by officials at the Montana State Auditor's Office on May 4, 2009 in Helena, Montana. She was represented by

---

[2]     Had Chubb denied Didier's claim it surely would have been subjected to a bad faith claim under Montana law.  Going to the State Auditor insulated the carrier from potential civil liability.

counsel and the interview was recorded. She justified her temporary housing claim by stating the monthly rent was based on a conversation she had with a representative at ALE, wherein ALE stated that she was due whatever it cost for hotel fees, regardless of where she ended up. Ms. Didier says the ALE representative likened her decision to live at the Rollins property to a decision to replace kitchen floor linoleum with dollar store linoleum at her option, regardless of the cost associated with maintaining her standard of living. Ms. Didier claimed in the interview that she was completely transparent about the ownership of the Rollins property and claimed that ALE expressed no issue with the ownership of the Rollins property.

Ms. Nasir also volunteered to be interviewed by telephone. An investigator with the Montana State Auditor's Office did so on July 21, 2009. Nasir admitted her role as broker for the C.D. Didier Family Trust in the replacement housing transaction for Didier. She refused to answer many questions regarding the transaction without reviewing her file. She then agreed to retrieve her file and contact the Auditor's Office. She did not follow up.

All of this gave rise to a September 2012 nine-count indictment. The Indictment charges Ms. Didier with seven counts of mail fraud, in violation of 18 U.S.C. § 1341, and one count of conspiracy to commit mail fraud, in violation of

18 U.S.C. § 371. It charges Ms. Nasir with one count of mail fraud, in violation of 18 U.S.C. § 1341, and one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371. A jury trial was held the week of March 18, 2013. On March 22, 2013 the jury found the Defendants guilty of all counts charged in the Indictment.

At the close of the government's case, Ms. Didier moved for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29. Counsel to Ms. Didier argued the government had failed to present sufficient evidence to sustain a conviction of Ms. Didier for any crime charged in the indictment. Specifically, counsel claimed the government did not provide sufficient evidence that Ms. Didier had the capacity to form specific intent to defraud or enter a conspiracy with Ms. Nasir. Furthermore, counsel claimed the government had failed to prove Ms. Didier's statements and representations were material to any act by Chubb Insurance.

Nasir also asked for a judgment of acquittal. Her lawyer argued the government had not presented sufficient evidence on which to convict Ms. Nasir of mail fraud or conspiracy to commit mail fraud. Specifically, he insisted there was no evidence of unlawful agreement to which Ms. Nasir was party and that Ms. Didier's mental disease or defect made such an agreement impossible.

The Defendants' Motions for Judgment of Acquittal were under advisement until after the jury's verdict pursuant to Federal Rule of Criminal Procedure 29(b). The jury returned its verdict finding the Defendants guilty of all counts March 22, 2013. Didier timely renewed her Motion for Judgment of Acquittal on April 5, 2013. Nasir timely renewed her Motion for Judgment of Acquittal the same day and also moved for a new trial.

## II.     Standards

On a defendant's motion, a court may set aside a jury verdict and enter an acquittal. Fed. R. Crim. P. 29. "The evidence is sufficient to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mincoff*, 574 F.3d 1186, 1192 (9th Cir. 2009) (citing *United States v. Dearing*, 504 F3d 897, 900 (9th Cir. 2007)). The court must "respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict." *United States v. Yoshida*, 303 F.3d 1145, 1149 (9th Cir. 2002) (citing *United States v. Goode*, 814 F.2d 1353, 1355 (9th Cir. 1987)). The court may not weigh conflicting evidence nor determine the credibility of

witnesses; that is the jury's exclusive purview. *United States v. Shelton*, 588 F.2d 1242 (9th Cir.1978) (citations omitted).

"A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992) (citation omitted). "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "[A] court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000) (citing *Alston*, 974 F.2d at 1211). A new trial before another jury is warranted if the court concludes that the evidence weighs heavily against the verdict and a serious miscarriage of justice may have occurred. *Id*. (citing *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).

## III. Analysis

The government brings this criminal fraud prosecution on the backdrop of an insurance policy Ms. Didier purchased from Chubb Insurance. Under the terms of the policy, Chubb was obligated to pay her an amount of money sufficient to maintain her household's usual standard of living following the losses she suffered

in 2008. The losses caused by the wind and fire at the Somers mansion were covered losses that triggered the standard of living clause. She was due that payment regardless of her representations about the Rollins property. The evidence is not sufficient to sustain the Defendants' convictions because there is no proof that any of Didier's deceptions were material, causing Chubb to pay more than was due under the policy. Beyond insufficiency of the proof, the ambiguous language of the policy as a matter of law precludes a finding of materiality of the Defendants' actions. Nothing Didier or Nasir said or did relieved Chubb of its obligation to pay the value of what she left as opposed to where she went. Absent a showing of materiality, no rational trier of fact could find all essential elements of the crime of mail fraud beyond a reasonable doubt. The Defendants' convictions must be set aside.

**A.    The Defendants' statements and representations were not material to Chubb Insurance's acts under the policy.**

The federal mail fraud statute prohibits the use of the mails to execute a scheme or artifice to defraud. 18 U.S.C. § 1341. In *Neder v. United States*, the Supreme Court considered the meaning of fraud in the context of § 1341, applying the rule that Congress intends to incorporate the well-settled meaning of the common law terms it uses. 527 U.S. 1, 23 (1999). When the mail fraud statute was

enacted in 1872, the well-settled meaning of "fraud" at common law included a requirement of misrepresentation or concealment of a material fact. *Id*. Accordingly, the Court presumed Congress' intent to incorporate a materiality requirement in the federal mail fraud statute. *Id.*

To secure a conviction for mail fraud, the government had to prove beyond a reasonable doubt that Ms. Didier and Ms. Nasir (1) knowingly devised or participated in a scheme or plan to defraud, (2) made statements or omissions of fact material to the scheme, (3) acted with specific intent to defraud, and (4) used the mails or caused the mails to be used. 18 U.S.C. § 1341; *United States v. Woods*, 335 F.3d 993, 997 (9th Cir. 2003). Due process requires the government to prove every fact necessary to constitute the crime charged beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970).

While *Neder* expressly incorporates materiality as an element of the crime of mail fraud, the case did not define materiality. *See United States v. Johnson*, 297 F.3d 845, 866 n.21 (9th Cir. 2002) ("at most, *Neder* stands for the proposition that alternative meanings of materiality are possible.") One meaning of materiality, as articulated by the Court in *United States v. Gaudin*, 515 U.S. 506, 509 (1995), and later embraced by the Ninth Circuit Court of Appeals, is that a statement is material if it "has a natural tendency to influence, or is capable of influencing, the

addressee's decision." The *Gaudin* formulation was approvingly cited by the Court in *Neder*, *Johnson*, 297 F.3d at 866 n.21 (citing *Neder*, 527 U.S. at 16), and is the preferred formulation in the Ninth Circuit, *United States v. Peterson*, 538 F.3d. 1064, 1071 (9th Cir. 2008).

Materiality is distinct from other elements of common law fraud. "The common-law requirements of 'justifiable reliance' and 'damages,' for example, plainly have no place in the federal fraud statutes." *Neder*, 527 U.S. at 24-25. This is because the mail fraud statute prohibits a "scheme . . . to defraud" and not the completed fraud. *See* 18 U.S.C. § 1341. While the language of the mail fraud statue is consistent with a requirement that the government prove materiality, it, by its own terms, does not impose a requirement of proof of actual reliance and damages. *Neder*, 527 U.S. at 25.

The jury was given two instructions on materiality. Instruction No. 13, which recited the elements of the mail fraud charged against Didier and Nasir, including materiality, was given. It charged the jury with determining whether ". . . the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money . . . ." (Doc. 92 at 13-14.)

Additionally, the jury was given a detailed instruction on materiality, above

and beyond the general elements instruction. Instruction No. 15 read:

> If you should decide that a particular statement or particular omission was misleading at the time it was made, then you must determine if the fact stated or omitted was a 'material' fact or 'material' omission under the evidence received in this case. Simply because a statement is false or misleading, does not automatically make it material.

> In order for you to find a fact or an omission 'material,' the government must prove beyond a reasonable doubt the fact misstated or the fact omitted was of such importance that it could reasonably be expected to cause or induce a person or organization to increase the disbursement provided above what would have been due under the policy. Assessment of 'materiality' requires you to view the fact misstated or the fact omitted in the context of all the evidence, including the total mix of information presented in the trial.

(Doc. 92 at 16.)

These instructions gave the jury detailed guidance on the materiality inquiry relevant to the mail fraud charged against Ms. Didier and Ms. Nasir. The relevant question before the jury was whether Didier and Nasir concocted a scheme to defraud that had a natural tendency to influence or was capable of influencing Chubb's determination of what to pay Ms. Didier for her losses in the insurance transaction in question when that amount was contractually constrained to maintaining her standard of living in the Somers mansion. Were the Defendants' misrepresentations material, "constituting an inducement or motive to the act or omission of the other party[?]" *Neder*, 527 U.S. at 22 (quoting J. Story,

Commentaries on Equity Jurisprudence § 195 (10th ed. 1870)).

Instruction No. 15 was given because the additional living expenses clause of the insurance policy is ambiguous as a matter of law. While materiality is an element of the crime charged which must be submitted to the jury to decide, *Gaudin*, 515 U.S. at 522, contract interpretation is a matter of law, *In re United States Financial Securities Litigation*, 729 F.2d 628, 631-32 (9th Cir. 1984). Specifically, "the determination of whether contract language is ambiguous is a matter of law." *Id*. "It is commonplace for [a] mixed question of law and fact to be assigned to the court for one purpose, and to the jury for another." *Gaudin*, 515 U.S. at 521.

The contract is ambiguous based on the plain language of the insurance policy. The additional living expenses provision of the policy is open to various interpretations. The heading of the paragraph reading "extra living expenses" could give rise to an interpretation that the insured is only due payment for additional expenses incurred as a consequence of the covered loss. The government argues this view. The text of the relevant paragraph, however, guarantees the insured payment for "the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living." This guarantee obligated the carrier to pay an amount based on the standard of

living enjoyed at the Somers mansion, with all of its accoutrements, prior to the loss.

The policy ambiguity raises reasonable doubt about the materiality element as a matter of law. The preambulatory statement "extra living expenses" suggests the amount of compensation paid by Chubb Insurance to Ms. Didier was to be based on the actual cost of her temporary housing. Under this interpretation, the Defendants' actions could have been material to Chubb's determination of the amount to pay under the policy. The text of the policy means the amount to be paid by Chubb to Ms. Didier was driven by her normal, usual standard of living at the mansion. Chubb knew this was a high end policy, generous in its obligation to its insured, and it cannot now claim criminal mail fraud because the insured was paid more than the Rollins property should have cost.

Construing all the facts adduced at trial in the light most favorable to the prosecution, there was not sufficient evidence of materiality of the Defendants' actions on which to base a conviction. The Indictment charged Ms. Didier and Ms. Nasir with defrauding Chubb Insurance. Chubb was the ultimate decisionmaker whose actions were allegedly the subject of the Defendants' fraud. Chubb and Chubb's agents are, therefore, the only possible source of evidence of the materiality of the Defendants' acts.

The trial record is threadbare on this question. Two Chubb employees testified at trial: Mr. Markey, the investigator and Mr. Petersen, the adjuster. Mr. Markey was only called to assist after the Defendants acted and after payments were disbursed for Ms. Didier's temporary housing at the Rollins property. His testimony confirmed the incongruities between the Rollins property as described and as it existed. Mr. Markey did not testify about decisions related to what Ms. Didier was due under the policy.

The other possible source to prove materiality was Mr. Petersen, Chubb's adjuster assigned to Ms. Didier's file. He testified to the high-end, liberal nature of the Masterpiece Policy Ms. Didier bought and paid for from Chubb. He characterized the policy as one requiring the white glove treatment Chubb offers the elite clients they service under this and comparable policies. His testimony did not establish that Chubb would have paid less under the policy had the Defendants accurately described the Rollins property. Construed in the light most favorable to the government, the only thing Petersen's testimony establishes is that Chubb's decision about what to pay Ms. Didier tracked with the ambiguous terms of the policy. He cited the need to compensate the insured to maintain the standard of living enjoyed at the covered property and also claimed the payment was for extra expenses. Neither alternative proved Chubb was not obligated to pay under the

terms of the policy or that it would have paid less but-for the Defendants'
misrepresentations. Without this evidence, the materiality of the Defendants' acts
cannot be proven, much less proven beyond a reasonable doubt. Indeed Chubb
may have paid just to get "that woman" out of its hair.

The indictment charges the Defendants with defrauding by mail Chubb
Insurance, not ALE Solutions, not the U.S. Bankruptcy Court. Chubb was
obligated under the contract of insurance to pay "the reasonable increase in [the
insured's] normal living expenses that is necessary to maintain [the insured's]
household's standard of living." Defining what is reasonable, what living expenses
are normal, what is necessary, and, most importantly, the insured's household's
standard of living, is a task loaded with subjective considerations and ambiguity.
When an event unquestionably triggers the policy and the insured opts to move
from the mansion covered by the policy to their own property, a cabin, and the
carrier pays what it owes under the ambiguous language of the policy based on the
loss to the mansion, there is no fraud nor can there be.

The government argues that Defendants' representations and statements
about the physical condition of the Rollins property to ALE Solutions were
ultimately material to Chubb Insurance because Chubb contracted with ALE to
find the replacement housing. This argument holds no water because Chubb was

ultimately obligated to pay what was due under the policy. The record is absent of any testimony on the part of Chubb Insurance that the Defendants' representations and statements were material to their calculation of what was due under the policy to maintain Ms. Didier's usual standard of living. Furthermore, the testimony of ALE employees at trial indicated that ALE did not calculate the amount owed under the policy. One ALE employee testified that the vendor had no contact with Chubb except to pass through the completed preap forms for approval. Chubb simply approved or denied the replacement housing ALE found. Chubb set a range for what it owed at $10,000 to $15,000 each month, an amount no different in essence from what it paid.

The proof regarding Chubb's determination of Didier's normal standard of living is related to its denial of the $40,000 per month corporate property and its charge to ALE to find something more comparable to the mansion Ms. Didier left. Both the Chubb adjuster and ALE's representative testified that after the corporate property was rejected, Chubb limited ALE's search criteria to properties renting for between $10,000 and $15,000 per month. Thus, the condition, ownership, or actual value of the Rollins property was not, and could not have been, material to Chubb's contractual obligation to compensate Ms. Didier that amount for her usual standard of living.

Another way to look at the problem is to invert it. Substituting Chubb Insurance as the defendant charged with wire fraud illustrates the untenable nature of the government's case. ALE found the corporate property and presented it to Chubb Insurance. Chubb's adjuster balked at the $40,000 per month price tag even though the contract could be read to require that payment. Chubb took a position that although the covered property was comparable in size to the mansion, ALE should only consider replacement properties with similar "useable space" to the Somers mansion. Nothing in the insurance contract allowed Chubb to redefine the standard of living clause. However by this unilateral command Chubb's obligation to pay its insured was recast. Was this, too, an incidence of criminal mail fraud? Chubb devised a plan to deprive its insured of a benefit which they were due under one interpretation of the policy. Its statements and actions led the insured to believe she was entitled to replacement property based only on the usable space of the covered property. And the insurer used the mails by sending checks to its insured for a property with a smaller size and price tag than the $40,000 corporate property originally proposed.

The government insists that the linchpin of its wire fraud charge was the Defendants' representations and statements to ALE about the ownership of the Rollins property and that these lies were material to Chubb's payment. The

Indictment charges Ms. Didier and Ms. Nasir with concocting a scheme to defraud Chubb Insurance, not ALE Solutions. For Defendants' representations about the ownership of the Rollins property to be material to Chubb, there would have to be proof that Chubb would have acted differently had it known that the C.D. Didier Family Trust was an entity solely controlled by Ms. Didier. The government could have called witnesses to establish this necessary fact, but it did not. Chubb's adjuster, again, is the only possible source of this crucial testimony. He offered no proof on the question. In fact, according to the notes and history compiled by ALE, Chubb's adjuster was not involved with the ultimate decision to approve Ms. Didier's move to the Rollins property. The notes and history indicate the adjuster's supervisor authorized Ms. Didier's move to the Rollins property on January 30, 2008. The adjuster did not, and could not, testify that the ownership of the Rollins property was material to his supervisor. Without this testimony no rational trier of fact, given the legal problems identified above, could find the government proved beyond a reasonable doubt that the Defendants' statements and representations were material to Chubb's decision.

In *United States v. Bryant*, the Eighth Circuit considered the materiality of representations made by an insured pursuant to an insurance policy. 606 F.3d 912 (8th Cir. 2010). There, a retired school teacher took out a long-term care insurance

policy and was later diagnosed with Alzheimer's disease. *Id*. at 915. Her insurer

determined she was entitled to benefits under the policy, which covered

reimbursement of up to $70.00 per day for necessary care expenses associated

with a long-term disability, including home health care services. *Id.* The insured

granted power of attorney to her son, who pursued claims with her insurer based

on services provided to his mother in her home by a Certified Nurse's Assistant.

*Id*. After the nurse's assistant stopped providing services, the insured's son

continued to submit claims to the insurer and continued to be reimbursed. *Id*. at

915-16.

Like the Defendants in the case at bar, the insured's son was charged with

criminal mail fraud, in violation of 18 U.S.C. § 1341. *Id*. at 916. He was found

guilty, and challenged the sufficiency of the evidence supporting his conviction on

grounds that his actions were not material. *Id*. at 916-17. The Court of Appeals

applied a definition of materiality which tracked closely with the *Gaudin*

formulation used in this case. *Id*. at 918. The insured's son argued he was entitled

to submit the claims because he provided home care to his mother after the nurse's

assistant stopped. *Id*. The court determined that, *in the context of the policy at*

*issue*, the son's actions were material because the policy only obligated the insurer

"to reimburse the *actual charges* [the insured] incurred for care provided by

qualifying providers." *Id*. (emphasis in original).

Bryant presents an analogous set of facts to this case in that the alleged fraud was pursuant to an insurance policy and the insured elected to step in with their own solution when a third-party provider was unavailing. The crucial difference, however, is in the terms of the insurance policy. In *Bryant*, the policy stated: "We will pay the *actual charges incurred* for a provider of Home Health Care up to the Home Health Care Daily benefits as shown in the Policy Schedule." *Id*. at 915 n.15. (emphasis supplied by the Eighth Circuit). Here, the language of the policy is at best ambiguous, stating the insurer is obligated to pay "Extra living expenses" and simultaneously pay what "is necessary to maintain your household's usual standard of living." The ambiguity of this crucial term raises doubt as a matter of law regarding the materiality of the Defendant's representations and actions. Chubb wrote the policy, charged significant premiums for the coverage, and deemed it a special liberally construed white glove policy. The government seeks to rewrite the "standard of living" language to mean "actual charges incurred" in order to satisfy the proof of materiality. It can't do so based on the language of Chubb's policy.

Without proof beyond a reasonable doubt of materiality, there is insufficient evidence on which to convict Ms. Didier and Ms. Nasir. The misrepresentations

about the condition and ownership of the Rollins property did not affect Chubb's duty to pay. There is no evidence that Chubb would not have paid the amount it did for the property, the security deposit, pet deposit, application fee, cleaning fee, and broker fee had the Defendants' been forthright about the condition and ownership of the Rollins property. Given the ambiguity of the insurance policy and absence of proof as to Chubb's decision to authorize the Rollins property, no reasonable finder of fact could find both Defendants guilty beyond a reasonable doubt.

**B.     A rational jury could conclude Ms. Didier acted with intent to defraud.**

Ms. Didier insists that there was insufficient proof of her intent to defraud because the testimony of medical experts conclusively demonstrated her mental impairment. Mail fraud is a specific intent crime. *United States v. Peters*, 962 F.2d 1410, 1414 (9th Cir. 1992). "In order to prove a violation of 18 U.S.C. § 1341, there must be a showing of a specific intent to defraud. The intent to defraud may be inferred from a defendant's statements and conduct." *Id*. (citations omitted). The jury was presented medical testimony regarding Ms. Didier's capacity to form the requisite *mens rea* to carry out the offense. Assessing this evidence in the light most favorable to the government, it is inappropriate to set aside the jury's verdict on these grounds. A rational juror could conclude the diagnosis was in error or

decide that, even if Ms. Didier was compromised, she still had the capacity to form the intent to deceive.

Ms. Didier also claims her interpretation of the insurance policy demonstrates she lacked the intent to defraud Chubb Insurance. Viewed in the light most favorable to the government, there is enough evidence in the record on which a rational juror might conclude Ms. Didier acted with intent to misrepresent the ownership condition of the Rollins property.

## C. Ms. Nasir's argument that jury notes demonstrate the insufficiency of the evidence is without merit.

While deliberating, the jury sent two notes to the Court expressing questions about the case. (*See* docs. 96 and 97.) The notes were difficult to decipher. After conferring with the parties, no additional instructions were given and the jury was told that they had the necessary information to come to a decision in the original set of instructions provided. Even if Ms. Nasir's interpretation of the notes is correct, they do not demonstrate the evidence was insufficient grounds on which to convict. Ms. Nasir argues the first note asks if the checks constitute the mail fraud and the second note asks which document induced the money to be sent.

An element of a criminal mail fraud prosecution is that the defendant used the mails or caused the mails to be used in committing the fraud. *See* 18 U.S.C. §

1341. "The defendant need not directly place items into the mail or order the mailing; instead, 'if the defendant does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he "causes" the mails to be used.'" *United States v. Hubbard*, 96 F.3d 1223, 1229 (9th Cir. 1996) (quoting *Pereira v. United States*, 347 U.S. 1, 8-9 (1954)). This law was presented to the jury in the instruction reciting the elements of the mail fraud offense. (*See* Instruction No. 13, doc. 92 at 13-14.) Nothing in the jury's note as interpreted by Ms. Nasir raises a question as to the proof that the alleged fraud caused the mails to be used.

The second jury note does not raise a question as to the proof of Ms. Nasir's guilt. Ms. Nasir's interpretation of the note suggesting that it asks which document induced the money to be sent, is not of consequence. The jury need not agree on a specific false statement or misrepresentation to sustain a conviction for mail fraud. *Woods*, 335 F.3d at 999. It was appropriate to instruct the jury to return to deliberations based on its earlier instructions in light of this note as interpreted by Ms. Nasir.

**D.    Ms. Nasir's analysis of documentary evidence is not sufficient grounds for judgment of acquittal.**

Ms. Nasir argues the records forming the basis for her conviction are insufficient evidence on which to convict her of mail fraud and conspiracy to commit mail fraud. Ms. Nasir takes a narrow view of the evidence and sets aside statements she made to investigators on which the jury might have reasonably concluded she acted with intent to defraud. Viewing all evidence in the light most favorable to the government, a rational juror could conclude the elements of the charges against Ms. Nasir, except materiality as discussed in part III.A. *supra*, were proven beyond a reasonable doubt.

Ms. Nasir raises an issue related to spoliation of evidence. She argues ALE and Chubb documents were selectively produced to the investigating agents and the government, and accordingly, not all documents were produced to the Defendants. She bases this argument on the fact that a version of the lease, Government Exhibit 41, was not produced by the government until mid-trial. Additionally, a document referred to by a government witness which the witness relied upon to conclude Ms. Nasir was not an attorney was never produced.

It is established that "the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Ms. Nasir only alludes

to the prospect that favorable evidence was suppressed in her post-trial briefing. She does not specifically argue that exculpatory evidence was withheld, only that "not all documents were produced[.]"

"In order for destruction of evidence to rise to the level of a constitutional violation, a party must make two showings. First, that the government acted in bad faith, the presence or absence of which 'turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed.' Second, that the missing evidence is 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013) (citations omitted). Ms. Nasir has not made either of these showings in her post-trial briefing.

**E.   If the judgment of acquittal is later vacated or reversed, a new trial is appropriate for each Defendant.**

Because a judgment of acquittal is appropriate, Ms. Nasir's motion for a new trial is moot. Federal Rule of Criminal Procedure 29(d), however, requires a determination of whether a new trial should be granted if this judgment of acquittal is vacated or reversed. Nasir's Motion for a New Trial pursuant to Federal Rule 29(d) is conditionally granted. In the event this judgment of acquittal is vacated or reversed by the Ninth Circuit Court of Appeals, a severed trial is

appropriate for each Defendant.

Although Ms. Nasir did not object to proceeding to trial with Ms. Didier, she argues in retrospect through her post-trial motions, that the decision to proceed to trial as a co-defendant was prejudicial. The Didier-Chubb insurance contract was central to the evaluation of the charges against the Defendants. Limiting instructions were given at trial and a limiting instruction was given to the jury regarding this evidence. (*See* Instruction No. 10, doc. 92 at 10.) Ms. Nasir's suggestion in her post trial brief that the case may have become overly complex in its proof for the instructions to have their desired effect is well taken. A severed trial is appropriate and in the interest of justice and due process for each Defendant if the judgment of acquittal is reversed.

## IV.    Conclusion

This criminal mail fraud case is missing an essential element: materiality. Chubb Insurance could have written the policy using more precise language, reflecting their obligation to pay only the actual cost of replacement housing. The insurer did not elect to write the policy using that language, instead it predicated its obligation to pay on an ambiguous term generously providing coverage for living expenses based on a standard of living in this case in a 14 bedroom mansion. The United States cannot invoke this ambiguity by attempting to

establish fraud in violation of 18 U.S.C. § 1341, effectively making the grand jury and this criminal court an enforcement mechanism for a policy dispute between a carrier and its insured.

In accordance with the foregoing, IT IS ORDERED that Ms. Didier's Motion for Judgment of Acquittal (doc. 106) is GRANTED.

IT IS FURTHER ORDERED that Ms. Nasir's Motion for Judgment of Acquittal (doc. 108) is GRANTED.

IT IS FURTHER ORDERED that Ms. Nasir's Motion for a New Trial (doc. 108) is CONDITIONALLY GRANTED.

IT IS FURTHER ORDERED that Ms. Nasir's Ex-parte Motion (doc. 120) is DENIED as MOOT.

IT IS FURTHER ORDERED that the Clerk of Court shall enter a judgment of acquittal and close this case.

DATED this 4th day of October, 2013.


DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT